**AFFIRM in Part, REVERSE in Part, and REMAND; Opinion Filed November 30, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-01085-CV

### MARTHA ARELY LARA LEMUS, JIMMY LEMUS
### AND JANE DOE, A MINOR CHILD, Appellants
### V.
### COOKSCREEK 255, LLC, AND
### MBP TEXAS, LLC, D/B/A CATALYST MULTIFAMILY, Appellees

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-15468**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Lang-Miers

An intruder broke into an apartment in the Cooks Creek complex where Martha Arely Lara

Lemus was in bed. He attacked her in view of Jane Doe, Martha's minor child. Martha and her

husband Jimmy sued Cookscreek 255, LLC, the owner of the apartment building, and MBP Texas,

LLC, d/b/a Catalyst Multifamily, the apartment manager,[1] alleging fourteen causes of action. The

trial court granted appellees' traditional summary judgment motion and denied the Lemuses'

special exceptions and their motion to reconsider based on newly-discovered evidence. We

conclude the Lemuses offered evidence raising a genuine issue of material fact about whether

Cookscreek failed to provide a functional window lock on the window through which the intruder

---

[1] Because Cookscreek and MBP Texas are represented by the same counsel and filed a joint brief, we refer to them collectively in this Opinion as "Cookscreek" except where indicated.

allegedly entered, but that Cookscreek established its right to judgment as a matter of law on certain other causes of action. Consequently, we affirm the trial court's summary judgment in part, reverse in part, and remand the case to the trial court for further proceedings.

## BACKGROUND

The Lemus family moved into an apartment in the Cooks Creek apartment complex in Farmers Branch on December 25, 2014. On the morning of December 26, 2014, after Jimmy Lemus left for work, Martha Lemus was awakened by an intruder, later identified as David Thomas a/k/a David Thames. In their operative petition, the Lemuses alleged that Thomas was able to break in through the apartment's front window because the window lock was "not operable or in good working condition." Thomas was dressed all in black and appeared to be holding a loaded pistol. He climbed on top of Martha as she lay in bed. She asked him, "what do you want?" and he replied, "pussy." The Lemuses alleged that Thomas assaulted Martha "by repeatedly whipping her with the pistol and punching her in the face" but then "relented and got up off of the Plaintiff," grabbed a laptop computer that was in the bedroom, and threw it at Martha before finally fleeing the apartment. The Lemuses also alleged that their daughter, Jane Doe, "witnessed the entire aggravated sexual assault of her mother at the hands of Defendant Thomas." Thomas was subsequently arrested and was awaiting trial at the time the Lemuses filed their operative petition.

Martha immediately called Jimmy,[2] who immediately called the police. After assisting the responding officers in preparing an incident report, Martha was transported to the hospital by ambulance to receive treatment for her injuries. Martha and her daughter have received psychological care and counseling for emotional trauma as a result of the assault.

---

[2] Martha testified that she first called Jimmy because she speaks only Spanish and was concerned that emergency personnel would not understand her.

The Lemuses did not spend another night in the apartment. Jimmy told the property manager that they were not going to return to the apartment out of concern for his family's safety. He testified that the property manager asked for a police report, which Jimmy obtained and attempted to deliver. A few days after the incident, however, the apartment complex personnel changed. The new employees told the Lemuses that they knew nothing about the attack, and if the Lemuses defaulted on the lease, Cookscreek would refer them to a collection agency, which Cookscreek subsequently did. The Lemuses responded by filing suit against the landlord, the property management company, Thomas, and the collection agency.[3]

The parties engaged in extensive discovery, including depositions of Jimmy and Martha, three police officers, three current or former employees of Cookscreek, and a licensed professional counselor who provided therapy to both Martha and Jane Doe. These witnesses testified that Martha fought off her attacker even after he hit her in the forehead with his gun, leaving a laceration that was bleeding profusely when officers arrived. She managed to pull off socks the attacker wore on his hands, and had the presence of mind to grab the laptop computer he had touched in the hope of preserving his fingerprints. And despite her injuries, Martha called for help and made sure that Jane Doe was taken safely away from the premises.

One of the responding police officers testified that a front window was open when he arrived on the scene. He attempted to close and latch the window, but was not able to do so. The window was not broken, and the officer did not see any evidence that the window had been forced or the lock jimmied.

The Lemuses alleged fourteen causes of action and a request for injunctive relief in their petition. Cookscreek moved for summary judgment on each cause of action. After the trial court

---

[3] Thomas and the collection agency are not parties to this appeal.

granted summary judgment, the Lemuses moved for reconsideration based on newly discovered evidence. The trial court denied the Lemuses' motion. This appeal followed.

## ISSUES

In their first issue, the Lemuses contend the trial court abused its discretion by failing to sustain their special exceptions to Cookscreek's motion for summary judgment. The first issue has eight subparts, each complaining of a specific cause of action.

In their second issue, the Lemuses contend the trial court erred by granting Cookscreek's motion for summary judgment. In fourteen subparts, the Lemuses contend they raised genuine issues of material fact on each of their causes of action.

In their third issue, the Lemuses contend the trial court erred by denying their motion to reconsider based on newly-discovered evidence.

## STANDARDS OF REVIEW

Different standards of review apply to the issues appellants raise. We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Under Texas Rule of Civil Procedure 166a(c), the party moving for traditional summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* at 215–16. When we review a traditional motion for summary judgment in favor of a defendant, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Durham v. Children's Med. Ctr. of Dallas*, 488 S.W.3d 485, 489 (Tex. App.—Dallas 2016, pet. denied). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life*, 128 S.W.3d at 215. A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Durham*, 488 S.W.3d at 489.

We review a no-evidence summary judgment under the same standard as a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). We examine the record in the light most favorable to the non-movant and disregard all contrary evidence and inferences. *Id.* at 751. If the non-movant produces more than a scintilla of probative evidence to raise a genuine issue of material fact, then summary judgment is improper. TEX. R. CIV. P. 166a(i); *King Ranch, Inc.*, 118 S.W.3d at 751. A party produces less than a scintilla of evidence when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). A party produces more than a scintilla of evidence if the evidence allows reasonable and fair-minded people to differ in their conclusions. *King Ranch, Inc.*, 118 S.W.3d at 751.

We review a trial court's ruling on a motion for new trial based on newly discovered evidence for an abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010); *Mitchell v. Bank of America, N.A.*, 156 S.W.3d 622, 629 (Tex. App.—Dallas 2004, pet. denied). A party seeking new trial on the ground of newly discovered evidence must show the trial court that (1) the evidence has come to its knowledge since the trial; (2) the failure to discover the evidence sooner was not due to lack of diligence; (3) the evidence is not cumulative; and (4) the evidence is so material that it would probably produce a different result if a new trial were granted. *Waffle House, Inc.*, 313 S.W.3d at 813; *Mitchell*, 156 S.W.3d at 629.

A trial court has broad discretion in ruling on special exceptions. *Gatten v. McCarley*, 391 S.W.3d 669, 673 (Tex. App.—Dallas 2013, no pet.). We reverse a trial court's ruling on special exceptions only if there has been an abuse of discretion. *Id.* Even under the abuse of discretion standard, however, we review the trial court's determination of legal questions de novo. *Id.*

DISCUSSION

**1. Special Exceptions**

A motion for summary judgment must "state the specific grounds therefor." TEX. R. CIV. P. 166a(c). Special exceptions are required "should a non-movant wish to complain on appeal that the grounds relied on by the movant were unclear or ambiguous." *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993). The excepting party must obtain a ruling on the special exception to preserve the issue for appeal. *Id.* at 343 n.7. The Lemuses filed special exceptions with their summary judgment response, and subsequently obtained a written order from the trial court denying the exceptions.

In their special exceptions, the Lemuses contended that for eight of their causes of action, Cookscreek did not give fair notice of the grounds for summary judgment:

| Cause of Action | Complaint |
| --- | --- |
| TEX. PROP. CODE § 92.164 | Failure to identify elements on which there is no material fact issue or no evidence |
| Premises liability | Failure to clarify elements on which summary judgment is sought for invitee or licensee cause of action |
| Negligence per se | Failure to identify specific evidence on legally acceptable excuse |
| Gross negligence | Conclusory; failure to identify specific evidence relied on |
| Loss of consortium | Failure to list elements of cause of action or to identify elements on which summary judgment is sought |
| Nuisance, TEX. CIV. PRAC. & REM. CODE § 125.0015 | Failure to identify elements of cause of action on which summary judgment is sought |
| Bystander recovery | Failure to identify "applicable defense" or to list elements of cause of action on which summary judgment sought |
| Negligence | Failure to request summary judgment on any element of cause of action |

We review each complaint to determine if the trial court abused its discretion by denying the Lemuses' special exceptions. *See Gatten*, 391 S.W.3d at 673.

### a. Property code section 92.164

Property code section 92.164 sets out tenant remedies for the landlord's failure to install or rekey the security devices listed in property code sections 92.153 and 92.156(a). TEX. PROP. CODE ANN. § 92.164. Section 92.153(a)(1) requires "a window latch on each exterior window of the dwelling." *Id.* § 92.153(a)(1).

The Lemuses' operative petition alleged that Thomas gained access to the apartment through a window because the window lock was not working properly and did not lock. They also alleged that Cookscreek failed to "ensure that the window locks in the apartment unit were fully functional and operational and in good working order at the time that Plaintiffs were provided possession of the apartment unit."

Cookscreek argued in its summary judgment motion that (1) "the competent evidence presented herein demonstrates that Plaintiffs **do not know** if the window locks were functional or not before the incident at issue occurred" (emphasis in original), and (2) the allegations are not supported by the testimony of the investigating police officers. Cookscreek supported its arguments with citations to specific summary judgment evidence attached to the motion. Cookscreek's grounds for requesting summary judgment on this claim were not unclear or ambiguous. *See McConnell*, 858 S.W.2d at 342. We conclude the trial court did not abuse its discretion by denying the Lemuses' special exception to Cookscreek's motion for summary judgment on the Lemuses' claim under property code section 92.164. *See Gatten*, 391 S.W.3d at 673.

### b. Premises liability

The Lemuses argued that Cookscreek's motion did not state grounds for summary judgment on their premises liability claim "with sufficient specificity." But in the motion, Cookscreek made two specific arguments.

First, Cookscreek argued that it owed a lesser duty to Jane Doe and Martha because they were only licensees, not invitees. Cookscreek argued that Jimmy was the only invitee because he was the only signatory on the lease. Cookscreek then listed the "elements of a cause of action for premises liability brought by an invitee." Cookscreek argued that Martha and Jane Doe were licensees, and listed a different set of elements for licensees "to successfully prosecute a cause of action for premises liability."

Second, Cookscreek argued the assault was not foreseeable, relying on and citing to police officers' testimony about crime in the area. These grounds were not unclear or ambiguous. *See McConnell*, 858 S.W.2d at 342. The trial court did not abuse its discretion by denying the Lemuses' special exception to Cookscreek's summary judgment motion on this ground. *See Gatten*, 391 S.W.3d at 673.

### c. Negligence per se

The Lemuses concede that Cookscreek's motion "list[s] the elements of a negligence per se action," but complain that "it is unclear on which elements" Cookscreek is seeking summary judgment. *See Moughon v. Wolf*, 576 S.W.2d 603, 604 (Tex. 1978) ("The unexcused violation of a statute constitutes negligence as a matter of law if such statute was designed to prevent injury to the class of persons to which the injured party belongs."). The Lemuses also argue that Cookscreek did not specify the evidence it relied on to support its argument that any violation of a statute that occurred was excused. *See id.* at 604–05 (party alleging negligence per se bears burden of proving

statutory violation, while violator must produce some evidence of legally acceptable excuse). We disagree.

In its motion, Cookscreek argued that it did not violate any of the statutes in question, and also argued in the alternative that any violation was excused or was not a proximate cause of the Lemuses' injuries. The Lemuses point to Cookscreek's concluding statements summarizing its arguments. But Cookscreek's motion also included lengthy quotations of the statutory language at issue and detailed discussion of witnesses' testimony about the window locks, the primary statutory violation alleged by the Lemuses. The trial court did not abuse its discretion by denying the Lemuses' special exception to Cookscreek's motion on this cause of action. *See Gatten*, 391 S.W.3d at 673.

### d. Gross negligence

The Lemuses specially excepted to Cookscreek's motion on their gross negligence claim as follows: "The Defendants make a conclusory assertion that there is evidence presented somewhere in their motion that they should be granted summary judgment on." We disagree. The motion points out, twice, that a claim for gross negligence requires evidence of the defendant's "actual, subjective awareness" of an "extreme degree of risk" and that the defendant "proceeded with conscious indifference" to the risk. Cookscreek then argues there is no such evidence in the record; the only evidence is that it was not aware of an extreme degree of risk. This ground was not unclear or ambiguous, and the trial court did not abuse its discretion by denying the Lemuses' special exception. *McConnell*, 858 S.W.2d at 342; *Gatten*, 391 S.W.3d at 673.

### e. Loss of consortium

Cookscreek argued in its summary judgment motion that loss of consortium "is not a separate cause of action." Citing *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990), Cookscreek argued that loss of consortium "is a type of damages." Cookscreek conceded that Jimmy and Jane

Doe "would *theoretically* be permitted to seek to recover this type of damages under Texas law" but argued that there is no independent cause of action on which judgment could be rendered by the trial court.

> In *Whittlesey v. Miller*, 572 S.W.2d 665, 666 n.1 (Tex. 1978), the court explained,
>
> The phrase "loss of consortium" is more accurately described as an element of damage rather than a cause of action. But courts have so frequently used the phrase to denote those actions in which loss of consortium is the major element of damage that "loss of consortium" has come to be referred to as a cause of action.

The court in *Whittlesey* held that "either spouse has a cause of action for loss of consortium that might arise as a result of an injury caused to the other spouse by a third party tortfeasor's negligence." *Id.* at 668. In *Reagan*, the court extended consortium rights to children "when a third party causes serious, permanent, and disabling injuries to their parent." *Reagan*, 804 S.W.2d at 467; *see also Roberts v. Williamson*, 111 S.W.3d 113, 116–18 (Tex. 2003) (discussing *Reagan* and *Whittlesey*).

Loss of consortium is a form of personal injury damage. *Strickland v. Medlen*, 397 S.W.3d 184, 191 (Tex. 2013). It includes "loss of 'love, affection, protection, emotional support, services, companionship, care, and society.'" *Id.* (quoting *Reagan*, 804 S.W.2d at 467). As the supreme court explained in *Reagan* and *Whittlesey*, it is derivative of a parent's or spouse's claim for personal injuries. *Reagan*, 804 S.W.2d at 467; *Whittlesey*, 572 S.W.2d at 667. Cookscreek's argument that the Lemuses must first establish liability on an underlying tort claim to recover loss of consortium damages was not unclear or ambiguous, *see McConnell*, 858 S.W.2d at 342, and the trial court did not abuse its discretion by denying the Lemuses' special exception on this issue.

### f. Nuisance

The Lemuses specially excepted to Cookscreek's motion on their common nuisance cause of action under civil practice and remedies code Chapter 125 because Cookscreek did not cite to any evidence to support traditional summary judgment and did not list the elements on which there

was no evidence. *See* TEX. CIV. PRAC. & REM. CODE ANN. Ch. 125 ("Common and Public Nuisances"). Cookscreek's motion combined the Lemuses' claim for public nuisance with their Chapter 125 claim for common nuisance. Cookscreek argued that the Lemuses lacked standing to assert a public nuisance claim, explained the definition of a public nuisance, and listed the elements of a public nuisance claim. Corkscreek did not, however, make a specific argument addressing the Lemuses' Chapter 125 claim.

In paragraph 25 of their operative petition, the Lemuses alleged that "Prior to the incident giving rise to suit, the apartment complex has also been the scene of crimes listed under CPRC 125.0015(a)." In their eleventh cause of action for common nuisance, they alleged:

> A person maintains a common nuisance if the person maintains a multiunit residential property to which persons habitually go to commit acts listed in Subsection (a) of 125.0015 and knowingly tolerates the acts and furthermore fails to make reasonable attempts to abate the acts. (See CPRC 125.0015(b)).

In its discussion of "public nuisance/common nuisance," Cookscreek's motion for summary judgment did not specifically address the Lemuses' allegation that "persons habitually go" to the Cookscreek apartments to commit the activities listed in the statute, including gambling, prostitution, aggravated assault, sexual assault, robbery, murder, criminal trespass, and other criminal activity, or Cookscreek's "knowing toler[ance]" of such activities. *See generally* TEX. CIV. PRAC. & REM. CODE ANN. § 125.0015(a)(1)–(27). But Cookscreek's motion addressed at some length the absence of evidence of a foreseeable risk of harm to invitees on the premises based on the factors set forth in *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756–59 (Tex. 1998), and the evidence of previous crimes on the premises, as we discuss below. For this reason, it was within the trial court's discretion to conclude that Cookscreek's motion was not unclear or ambiguous in seeking summary judgment on the ground that Cookscreek did not knowingly tolerate habitual criminal activity on the premises.

### g. Bystander recovery

The Lemuses argue that Cookscreek did not cite to any evidence to support traditional summary judgment on their bystander claim and did not list the elements on which there was no evidence. They also argue that Cookscreek failed to specify the "applicable defense" it claims is a bar to their recovery. But Cookscreek's motion listed the elements of a bystander claim, citing supporting authority, and argued that a bystander may not recover mental anguish damages if the primary victim's recovery is barred by an applicable defense. Cookscreek then explained that because there was no breach of duty to Martha, Jane Doe could not recover as a bystander. This ground was not unclear or ambiguous, and the trial court did not abuse its discretion by denying the Lemuses' special exception. *McConnell*, 858 S.W.2d at 342; *Gatten*, 391 S.W.3d at 673.

### h. Negligence

The Lemuses specially excepted that "Defendants haven't actually moved for summary judgment on any of the elements of the negligence cause of action." As the supreme court has explained, "[p]remises liability is a special form of negligence where the duty owed to the plaintiff depends upon the status of the plaintiff at the time the incident occurred." *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). Cookscreek's motion addressed the Lemuses' premises liability claim at length, including an explanation that "[p]remises liability is a type of ordinary negligence action," "invok[ing] concepts of duty, breach, and proximate cause." Cookscreek explicitly argued that "Plaintiffs' cause of action for premises liability also fails, as a matter of law." It argued that under *Timberwalk*, it had no duty to the Lemuses because the risk of harm was not foreseeable. The trial court did not abuse its discretion by denying the Lemuses' special exception to Cookscreek's motion on this issue. *See Gatten*, 391 S.W.3d at 673.

### i. Conclusion

We conclude that the trial court did not abuse its discretion by denying the Lemuses' special exceptions. *See Gatten*, 391 S.W.3d at 673. We decide the Lemuses' first issue against them.

### 2. Motion to Reconsider

We consider the Lemuses' third issue before their second because it affects whether we include certain evidence in our review of the trial court's summary judgment. In their third issue, the Lemuses contend the trial court erred by denying their motion to reconsider based on newly discovered evidence. Cookscreek responds that we should review this complaint under the standards applicable to a trial court's denial of a motion for new trial based on newly discovered evidence. In reply, the Lemuses argue that because the trial court recited that it considered "new evidence submitted by Plaintiffs" in its order denying their motion, we must also consider the new evidence in reviewing whether the trial court erred by granting Cookscreek's motion for summary judgment.

The Lemuses rely on *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723 (Tex. App.—San Antonio 2014, pet. denied), in support of their argument. In *PNP Petroleum*, the court of appeals considered evidence attached to a motion to reconsider in reviewing the trial court's summary judgment ruling. *See id.* at 730–31. Citing due process concerns that are not present here, the court decided to consider the evidence because two of the parties proffering it had not been parties to the suit at the time of the trial court's initial summary judgment ruling. *See id.* at 731. In reaching its conclusion, the court relied on cases in which the trial court's order denying a motion to reconsider specifically stated that the trial court had considered the new grounds or new evidence. *See id.* at 729–31. Quoting its previous memorandum opinion, the court explained that a trial court may "'reaffirm its summary judgment based on the entire record.'" *Id.* at 729 (quoting *Charbonnet*

*v. Shami*, No. 04-12-00711-CV, 2013 WL 2645720, at *5 (Tex. App.—San Antonio June 12, 2013, pet. denied) (mem. op.)). The Lemuses argue in their reply brief that this Court should consider the newly discovered evidence in its de novo review of the trial court's summary judgment.

The Lemuses also argue that we need not consider the standards applicable to a trial court's denial of a motion for new trial based on newly-discovered evidence. *See Waffle House, Inc.*, 313 S.W.3d at 813 (standards for new trial on ground of newly discovered evidence). They contend the trial court considered the new evidence without reference to the applicable standards, so we should as well. We decline to do so, for three reasons.

First, the substance of the Lemuses' motion was a request for new trial. They asked the trial court to "grant [their] request for reconsideration and issue a new order denying [defendants'] motion for summary judgment." The Lemuses sought to set aside the existing summary judgment in Cookscreek's favor for the purpose of relitigating the issues based on new evidence. *See PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 715–17 (Tex. App.—Dallas 2011, pet. denied) (motion seeking to relitigate some of the issues in the case was motion for new trial). Courts are to give effect to the substance of a motion rather than its title or form. TEX. R. CIV. P. 71; *In re J.Z.P.*, 484 S.W.3d 924, 925 (Tex. 2016) (per curiam).

Second, the supreme court requires a party seeking a new trial on the ground of newly discovered evidence to establish the four matters set forth in *Waffle House, Inc.* and other cases, including the party's diligence in discovering the evidence. *See Waffle House, Inc.*, 313 S.W.3d at 813. We have explained that "[a] movant's mere allegations will not suffice to obtain a new trial on the basis of newly discovered evidence; rather, admissible evidence must be introduced at a hearing on the motion for new trial establishing such essential facts as no prior knowledge on the part of the movant, the prior diligence exercised by the movant, and the nature of the newly discovered evidence." *Strong v. Strong*, 350 S.W.3d 759, 772 (Tex. App.—Dallas 2011, pet.

–14–

denied). The record does not reflect that the Lemuses introduced evidence on these matters in the trial court.

Third, the Lemuses' appellate brief does not contain argument on this issue. Instead, the brief gives a reference to the page in the clerk's record where its motion to reconsider may be found.[4] The citation to the clerk's record is to approximately 300 pages of records. We may not search the record for facts that may be favorable to a party's position, and we are not responsible for doing the legal research that might support a party's contentions. *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.); *see also Sink v. Sink*, 364 S.W.3d 340, 345 (Tex. App.—Dallas 2012, no pet.) ("The law is well established that to present an issue to this Court, a party's brief shall contain, among other things, a concise, nonargumentative statement of the facts of the case, supported by record references, and a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). We decide the Lemuses' third issue against them.

### 3. Summary Judgment

The Lemuses' second issue is divided into fourteen lettered subparts, each addressing a cause of action. We refer to those lettered subparts in addressing the issues.

#### a. Validity of lease agreement (2.A and 2.B)

In issue 2.A, the Lemuses argue they raised fact issues that the lease "was either a forgery or was somehow manipulated." In issue 2.B, the Lemuses contend the trial court erred by determining that they breached a provision of the lease allowing guests to stay at the apartment for up to three consecutive days.[5] The Lemuses explain in their reply brief that these issues are in

---

[4] The brief also includes a chart giving dates and incident numbers of offenses from police reports "over the past 6 years for the complex," but the chart does not include citations to supporting documentation in the clerk's record or any analysis or comparison of the offenses listed to the facts of this case.

[5] We note there is nothing in the record to indicate that the trial court made any ruling regarding the Lemuses' breach of, or liability under, the lease agreement.

response to Cookscreek's argument that Martha and Jane Doe were not "invitees" for purposes of their premises liability claim.[6] We agree with the Lemuses that Martha's and Jane Doe's status as invitees is not dependent upon whether they signed the lease agreement. *See, e.g., Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 514–15 (Tex. 1978) (explaining that "the duty that the landlord owed to [the tenants] extended to their guest"). We address the parties' arguments regarding premises liability in our discussion of issue 2.E below.

In issue 2.N, the Lemuses contend they raised a fact issue on their claim that Cookscreek breached the lease. This claim depends on the lease's validity. We conclude the Lemuses' arguments that the lease was invalid, relevant only to Cookscreek's argument that Martha and Jane Doe were not invitees, need not be considered further. We decide issues 2.A and 2.B against the Lemuses.

### b. Property code section 92.0161 (Issue 2.C)

In issue 2.C, the Lemuses argue that the trial court erred by granting summary judgment on their cause of action under property code section 92.0161. This provision allows tenants to vacate premises and terminate their rights and obligations under a lease following certain sex offenses or stalking if they comply with specified procedures. TEX. PROP. CODE ANN. § 92.0161. The provision requires the tenant to provide specified documentation to "the landlord or the landlord's agent." *See id.* § 92.0161(b), (c), (c-1). Tenants may then terminate the lease, vacate the dwelling, and avoid liability if they provide the specified documentation to the landlord, give written notice of termination to the landlord, and vacate the dwelling within the periods specified in the statute. *See id.* § 92.0161(d). A landlord who violates section 92.0161 is liable to the tenant for actual damages, a specified civil penalty, and attorney's fees. *Id.* § 92.0161(f). Among other

---

[6] In a supplemental answer, Cookscreek pleaded that Martha and Jane Doe "were not permitted 'occupants' of the apartment unit at issue in this case," and consequently, "were not invitees as defined by applicable Texas law on the date and time of the incident made the basis of this suit." In its motion for summary judgment, Cookscreek argued that Martha and Jane Doe were licensees to whom Cookscreek owed a lesser duty.

grounds, Cookscreek argued that summary judgment was proper on this claim because the Lemuses did not give written notice of termination to the landlord as required by section 91.0161(d)(2).

The Lemuses argue they raised a fact issue on their cause of action under section 92.0161, relying on:

1. testimony by Aida Acosta, a leasing agent for MBP, that she thought the Lemuses had turned in a notice of termination of their lease after they moved out;

2. Martha's testimony that Jimmy provided the police report to the management at Cookscreek; and

3. Jimmy's testimony that he gave the apartment manager a copy of the police report. And because Jimmy did not recall when he turned in the report, the Lemuses argue that we must resolve doubts about timeliness in their favor.

Martha also testified that on the day of the incident, Jimmy told Benjamin Gonzalo Dominguez, the apartment manager, that "we will not be in the apartment for safety." Martha testified that Dominguez replied "that it will be fine, that only for [Jimmy] to bring the police report and that the contract will be null." Martha explained that Jimmy obtained the police report three or four days later. When Jimmy returned to the apartment complex with the police report, however, neither Dominguez nor the secretary who had shown the apartment to the Lemuses was there. The "new people" told Jimmy "that they didn't know anything about that case" and the Lemuses would be referred to a collection agency.

We conclude the Lemuses did not raise a genuine issue of material fact regarding their compliance with subsection 92.0161(d)(2), requiring tenants to provide "written notice of termination of the lease to the landlord on or before the 30th day before the date the lease terminates." Jimmy testified he gave verbal notice to Dominguez and provided a copy of the police report. Martha confirmed this testimony. But the Lemuses did not offer any evidence that they

–17–

gave written notice of termination of their lease to Dominguez or to any other Cookscreek personnel.

In light of this evidence from the Lemuses, Acosta's testimony that she "believed" the Lemuses gave written notice after they moved out is insufficient to raise a fact issue. Acosta testified she had never met or spoken to the Lemuses, and neither she nor the Lemuses provided any other evidence to support her possible recollection. We conclude that the evidence is "so weak as to do no more than create a mere surmise or suspicion" that the Lemuses gave written notice of termination. *See Kindred*, 650 S.W.2d at 63.

Because the Lemuses did not raise a fact issue on their compliance with subsection (d)(2) of section 92.0161, they did not raise a fact issue on Cookscreek's liability for the damages and penalties under subsection (f) of that section. *See* TEX. PROP. CODE ANN. § 92.0161(f) (landlord who violates section 92.0161 is liable to tenant "for actual damages, a civil penalty equal to the amount of one month's rent plus $500, and attorney's fees"). We decide issue 2.C against the Lemuses.

### c. Property code sections 92.153 and 92.164 (2.D)

Property code section 92.153 requires that "a dwelling must be equipped with: (1) a window latch on each exterior window of the dwelling," at the landlord's expense, and "without necessity of request by the tenant." TEX. PROP. CODE ANN. § 92.153(a)(1), (c). If the landlord does not comply with section 92.153, the tenant may "file suit against the landlord without serving a request for compliance and obtain a judgment" for remedies including actual damages and court costs. TEX. PROP. CODE ANN. § 92.164(a).

Cookscreek sought summary judgment on this claim by arguing that "the Plaintiffs do not know if the window locks were functional or not before the incident at issue occurred" because they did not check to see if the windows were locked before Thomas broke in. Cookscreek also

argued that the Lemuses were obligated to identify defects with the window locks after they took possession of the apartment. And Cookscreek argued that the testimony of the police officers did not support the Lemuses' claim that the lock on the window was not functional.

We conclude the Lemuses raised a fact issue whether Cookscreek complied with section 92.153(a)(1). Officer Steven Rutherford of the Farmers Branch Police Department testified that he was dispatched to the Lemuses' apartment on December 26 at approximately 9:00 a.m. He observed that "the front living room window was open." He agreed that the police report listed the method of entry as "no force." He explained what "no force" meant:

A. Well, typically when we're looking at forceable [sic] when we're talking about a window it's either been pried open, the glass has been broken out of it; or even when we talk about a door, door possibly being kicked in, someone had to force their way past that, whether window, door, wall, whatever it might be. That's when we're talking about force actually being used.

Officer Jason Roddy, who also responded to the call and prepared the incident report, also testified about the meaning of "no force" on the incident report:

A. Right. So force would mean like if the window—if the glass on the window was actually broken on any window of the apartment or if the door were pried or damaged in some way in order to force entry into the apartment.

Officer Ernesto Griego, who responded to the call and spoke with Martha, was asked the same question, and responded:

A. That means he was—something was unlocked or, you know, there was—they were able to jimmy something—a lock or something like that to the point where there doesn't show to be any kind of damage or any kind of forced entry. That's kind of how we take that as.

Near the end of his investigation, Rutherford examined the front window. There was a lock on the window. Rutherford testified:

Q. Did you examine the lock?

A. I attempted to close the window and could not get the window latch to fasten.

Q. So in your opinion was the latch functioning?

[objections omitted]

A. Okay. I could not secure that window using that latch when I tried to secure that window at the end of my investigation.

Q. So you tried to close the window and secure the latch, and it would not close?

A. Yes, sir.

. . . .

Q. Okay. Just so I'm clear, could we go over that again. So you examined the window that was open, right?

A. Yes, sir. And an attempt—in an attempt to close that window and to latch it, I was unable to secure that window.

Q. Okay.

A. I was unable to get it to latch.

Later in his deposition, Rutherford confirmed that he was not able to get the window lock to fasten, and testified that he did not know whether "the offender" or the tenant caused any damage to the lock. Rutherford "made notes that I did not observe any obvious signs of damage to the locking mechanism or the window."

Griego testified that he also looked at the window "as things kind of cooled down" in the investigation. He recalled,

A. Yes. I think it, if I'm not mistaken, slides left to right, and I believe that it didn't—it didn't lock. There was no security device to keep it from—so it opened freely. It opened freely.

Q. Was there a lock at all on it or—

A. I don't remember if it was the locks that were malfunctioning or if there wasn't a lock on it. That part, I don't know. I just know that the window didn't—there was no locking—the locking mechanism didn't work or if there was one on it. I just know that there was an issue with the window.

We conclude the Lemuses raised a genuine issue of material fact whether Cookscreek complied with property code section 92.153. Rutherford testified that he "could not secure that window using that latch." He testified that he attempted to close and latch the window, but he was

–20–

"unable to get it to latch." Griego testified that "there was an issue with the window." A possible inference from this evidence is that Thomas obtained entry by damaging the lock, but Rutherford testified that there were no "obvious signs of damage to the locking mechanism or the window," and the police report showed "no force" as the method of entry. Based on this evidence, a rational juror could also conclude that Thomas was able to gain entry because the lock was not functional.

Although Cookscreek argues that the Lemuses failed to check the lock and inform Cookscreek of any defect, section 92.153 unambiguously places the burden on the landlord to provide a window latch without the necessity of a request by the tenant. Cookscreek allowed tenants a period of 48 hours to complete a form to report any defects, but (1) the time for returning that form had not yet elapsed at the time Thomas entered the apartment, and (2) the Lemuses moved in to the apartment on Christmas day when Cookscreek's office was closed. Martha testified that the secretary at Cookscreek "told us to write down the things that we see that were not working. Because it was a holiday, it was closed, so we could not take it." Martha testified that they planned to fill out the form and turn it in the following day, but because the assault occurred on that day, they did not complete and turn in the form. But in any event, evidence of a tenant's compliance with a landlord's policies about reporting maintenance problems is not probative on the question whether the landlord complied with section 92.153 in the first instance. We conclude the Lemuses raised a genuine issue of material fact on their cause of action under sections 92.153 and 92.164. We decide issue 2.D in favor of the Lemuses.

### d. Premises liability (2.E)

The Lemuses' brief raises several issues relating to their premises liability claim. They contend that Martha and Jane Doe were invitees on the premises. They argue that the inoperable window latch posed an unreasonable risk of harm, and that Cookscreek knew or reasonably should have known of the danger. And they argue that Thomas's assault on Martha was foreseeable

because of the proximity, recency, frequency, similarity, and publicity of other crimes on the property or in its immediate vicinity. *See Timberwalk*, 972 S.W.2d at 757 ("In determining whether the occurrence of certain criminal conduct on a landowner's property should have been foreseen, courts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them.").

On appeal, Cookscreek does not challenge the Lemuses' contention that Martha and Jane Doe, as well as Jimmy, were invitees on the premises. But Cookscreek argues that it did not know or have reason to know of an unreasonable and foreseeable harm to the Lemuses.

In their summary judgment response, the Lemuses relied on testimony that they characterize as follows: (1) Rutherford and Roddy testified that on a scale of one to ten, with ten being "really high" crime, the Cooks Creek apartment complex was a "seven or eight"; (2) Jessica Najera, a leasing consultant for MBP who worked at the complex, testified that someone broke in to the Lemuses' apartment two weeks before they moved in; (3) the window of the Lemuses' apartment was broken by an unknown person two weeks before they moved in; (4) Dominguez, the apartment manager, was aware that unknown persons had broken into other vacant apartment units at Cooks Creek prior to the date the Lemuses moved in; (5) Rutherford, Roddy, and Griego testified they had responded to reports of vehicle and apartment burglaries at the complex; and (6) Griego testified that although he had not been called to the complex to investigate a murder, "I know there [has] been a call out there for that." The Lemuses also relied on (1) a Farmers Branch police incident report of breaking and entering and burglary of a habitation at the Cooks Creek apartments on August 19, 2014; and (2) a Farmers Branch police incident report of burglary of a motor vehicle in the Cooks Creek apartment complex on February 4, 2015.

–22–

On appeal, the Lemuses rely heavily on their second allegation that "[t]he exact apartment the Lemuses moved into had been broken into prior to the Plaintiff's moving in," citing Najera's testimony. The record reflects Najera's initial testimony that "before the Lemus family even moved in," perhaps two weeks before, she noticed a broken window at their apartment. She testified that "[i]t looked like maybe a rock had been thrown in"; there was a "hole in the window" and broken glass inside. She reported the problem to Dominguez, and the window was replaced within two days: "we got that taken care of before the Lemuses moved in." The window was not broken when she walked the property after the Lemuses moved out. Later in her deposition, Najera was asked whether the apartment with the broken window was actually the Lemuses' apartment. She testified: "I don't know if that's the exact apartment, but I think it might have been. Or if not, maybe one of the neighboring apartments next to it." And she later described it as "a broken window in that area where their apartment was." This testimony is some evidence that there was a hole in the Lemuses' window that was repaired before they moved in, but Najera did not testify that "someone had broken into" the Lemuses' "specific unit" two weeks before they moved in as the Lemuses contend. The Lemuses do not cite any other evidence in the record to support this allegation. Consequently, there is evidence that two weeks before the Lemuses moved in, a window was broken either in their apartment or nearby, but there is no evidence that their apartment "had been broken into" by someone gaining entrance through a broken window.

"As a general rule, a person has no legal duty to protect another from the criminal acts of a third person . . . ." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). "But a property owner who 'controls the premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee.'" *UDR Tex. Props., L.P. v. Petrie*, 517 S.W.3d 98, 100 (Tex. 2017) (quoting *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1997)). A risk must be foreseeable and

unreasonable to impose a duty on a property owner. *Id.* at 101. We consider the evidence in light of the *Timberwalk* factors to determine foreseeability. *See id.* ("This Court conceived the *Timberwalk* factors as a means to aid courts in determining foreseeability specifically.").

The Lemuses cite *Timberwalk* for the proposition that a past burglary indicates that a rape is more foreseeable: "Property crimes may expose a dangerous condition that could facilitate personal crimes, as when apartments are targeted repeatedly by thieves. 'If a burglar may enter [an apartment], so may a rapist.'" *Timberwalk*, 972 S.W.2d at 758 & n.44 (quoting *Aaron v. Havens*, 758 S.W.2d 446, 448 (Mo. 1988)). We consider the summary judgment evidence in light of the *Timberwalk* factors to determine foreseeability. *See Petrie*, 517 S.W.3d at 101.

### i. Proximity

The Lemuses rely on evidence of alleged criminal activity at the Cooks Creek apartment complex itself or in the neighboring area. Consequently, the proximity factor is met.

### ii. Recency

The window in or near the Lemuses' apartment was broken two weeks before they moved in. The report of breaking and entering and burglary of a habitation in August, 2014, was four months before the assault on Martha. Griego testified that the murder call at the complex was "a couple of years" before the assault on Martha but "I can't give you a time frame." *See JPMorgan Chase Bank, N.A. v. Borquez*, 481 S.W.3d 255, 274–75 (Tex. App.—Dallas 2015, pet. denied) (two years is reasonable time in considering recency factor). The burglary of a motor vehicle occurred after the assault on Martha, and consequently is not probative of foreseeability under the *Timberwalk* factors. For the remainder of the criminal conduct alleged by the Lemuses, there is no evidence regarding specific dates.

### iii. Frequency

The police officers testified generally that the complex and its surrounding area was a "seven or eight" level of crime on a scale of ten, and that they had responded to reports of vehicle and apartment burglaries at the complex. None of the officers, however, testified about any specific incidents on any particular dates, or estimated how often they were called to the complex. Two of the officers also testified that they did not recall responding to a rape or sexual assault report at the complex; the third officer testified that rape calls are "definitely not common" in the area. Only one officer recalled he had heard about a murder on the premises.

Griego testified about the frequency of being called to the complex for matters such as family violence, intoxicated persons causing a disturbance, and burglaries of vehicles:

> I mean, it doesn't happen on a day-to-day basis, but it—you know, it could be time of the year that it does. I can't tell you that we go there a lot, but we do go there for those type of disturbances. And it could be very minor as well, too.

Similarly, there is no specific evidence regarding the frequency of break-ins to vacant apartments.

There was a single incident of a broken window and a single incident of breaking and entering with burglary of a habitation.

### iv. Similarity

The exact sequence of events that produced the harm need not be foreseeable. *Park v. Exxon Mobil Corp.*, 429 S.W.3d 142, 147 (Tex. App.—Dallas 2014, pet. denied). Rather, previous crimes need only be sufficiently similar to the crime in question to put the owner on notice of the specific danger. *Id.* at 147–48. As the Lemuses argue, the breaking and entering and burglary of a habitation in August 2014 is the type of crime that "may expose a dangerous condition that could facilitate personal crimes, as when apartments are targeted repeatedly by thieves." *See Timberwalk*, 972 S.W.2d at 758; *accord*, *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 16 (Tex. 2008) ("a string of violent crimes such as robberies or assaults can make other violent crimes like

–25–

murder or rape foreseeable; a thief entering a dwelling to steal property may also commit personal crimes"); *Park*, 429 S.W.3d at 148 (same). In the August 2014 incident, however, an unknown actor entered through the front door of a locked apartment and took a television, $400, and a safe when the tenant was not at home. This single incident did not involve a personal crime, expose a dangerous condition that facilitated personal crimes, or show that apartments in the complex were "targeted repeatedly by thieves." *See Timberwalk*, 972 S.W.2d at 758.

Broken windows or break-ins to vacant apartments, without accompanying burglary or personal crimes, are not similar to violent crimes. *See, e.g., Walker*, 924 S.W.2d at 377–78 ("four prior incidents of vandalism and one instance when a refrigerator was taken from a vacant apartment" were not similar to violent criminal act of stabbing victim). There was no evidence that break-ins to vehicles in the parking lot at Cooks Creek "involve[d] any confrontations, violent or otherwise, between the thieves and their victims." *See Tex. Real Estate Holdings, Inc. v. Quach*, 95 S.W.3d 395, 400 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (violent carjacking not foreseeable from car thefts or thefts from cars at apartment complex). There is no evidence of the circumstances of the murder, whether in an apartment or outside, whether family violence was involved, whether the perpetrator broke into the victim's apartment, or any other detail to determine similarity to the assault on Martha. And although the police officers testified that the complex and surrounding area was a "seven or eight" out of ten, both Rutherford and Griego testified they could not recall responding to any rapes or sexual assaults at the complex, and Roddy testified that rape calls are "definitely not common" in the area. Griego was asked to describe "what kind of criminal complaint" was involved when he had responded to calls about "violent crime" in the area:

> Mainly it's—it's mainly like either it's going to be like a family violence call. Sometimes it may even be just, you know, some intoxicated subject may be causing a disturbance. Sometimes there's juveniles in the area, like especially with school being out and whatnot you may—there may be calls for like burglaries as far as like

vehicles, you know, that type of call. I mean, but like I say, I can't tell you exactly for which kind of call it was or how many times it was.

### v. Publicity

There is evidence that Cookscreek's property manager knew of the broken window at or near the Lemuses' apartment and break-ins to vacant apartments at the complex. For the remainder of the criminal conduct alleged by the Lemuses, there is no evidence regarding Cookscreek's knowledge.

### vi. Conclusion

Considering the five *Timberwalk* factors, we conclude as a matter of law that the assault on Martha was not foreseeable based on evidence of prior crimes. The summary judgment record does not contain evidence raising fact issues on recency, frequency, similarity, and publicity of other crimes. For example, there was no evidence to consider under these factors for the one violent personal crime the Lemuses cite, a murder some two years before the assault on Martha. Break-ins at vacant apartments or burglaries of vehicles are not sufficiently similar to give rise to a duty in this case. *See, e.g., Quatch*, 95 S.W.3d at 400. There was no evidence of these factors on any of the criminal activity the officers considered in assigning a level of "seven or eight" to the area, and two of the officers did not recall responding to rape or sexual assault reports at the complex. A third officer testified that reports of rape were "rare," and gave no detail regarding any. We decide issue 2.E against the Lemuses.

### e. Negligence per se (2.F)

The Lemuses allege negligence per se arising from Cookscreek's violations of five statutes or ordinances. Negligence per se is a concept adopted by the civil courts in which a duty is based on a standard of conduct created by a statute rather than on the reasonably prudent person test used in pure negligence claims. *Ward v. ACS State & Local Solutions, Inc.*, 328 S.W.3d 648, 652 (Tex.

App.—Dallas 2010, no pet.). To prove negligence per se, a plaintiff must show that a statute or ordinance was violated and that the violation was the proximate cause of damages. *Id.*

The Lemuses allege that Cookscreek violated three sections of the Farmers Branch Code of Ordinances and one section of the property code by its failure to install a working window latch. In support, they argue, "Officer Rutherford said in his deposition that he couldn't get the window to lock." But the property code provides that "[t]he duties of a landlord and the remedies of a tenant under this subchapter [Chapter 92, Residential Tenancies, Subchapter D, Security Devices] are in lieu of common law, other statutory law, and local ordinances relating to a residential landlord's duty to install, change, rekey, repair, or replace security devices and a tenant's remedies for the landlord's failure to install, change, rekey, repair, or replace security devices . . . ." TEX. PROP. CODE ANN. § 92.170. The Lemuses' remedies for Cookscreek's alleged failure to install a working window latch, whether in violation of local ordinances or the property code, have been set forth by the Legislature in property code section 92.164. *See* TEX. PROP. CODE ANN. § 92.164 ("Tenant Remedies for Landlord's Failure to Install or Rekey Certain Security Devices"). Under the plain language of section 92.170, its remedies are "in lieu of" other statutory law and local ordinances such as those on which the Lemuses rely. Consequently, summary judgment was proper on the Lemuses' negligence per se claims arising from alleged violations of the property code and local ordinances.

The Lemuses' fifth negligence per se claim arises from their allegation that Cookscreek violated section 125.0015 of the civil practice and remedies code by maintaining a "common nuisance." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 125.0015. The Lemuses argue that the police officers' testimony about criminal activity in the Cooks Creek apartment complex is some evidence that Cookscreek maintained a common nuisance in violation of the statute. We consider

this issue in our discussion of issue 2.K below. For the reasons we discuss there, we decide this portion of issue 2.F against the Lemuses.

### f. Gross negligence (2.G)

Cookscreek moved for summary judgment on the ground that there was no evidence that it had actual, subjective awareness and knowledge of a risk but proceeded anyway with conscious indifference to the Lemuses' safety. It also argued that there was no evidence of any act or omission that, when viewed objectively from Cookscreek's standpoint at the time it occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. And it argued that there was no evidence of malice, "defined as the specific intent to cause substantial injury or harm to the Plaintiff." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (definition of gross negligence).

In response, the Lemuses cited evidence that (1) Rutherford was not able to get the window to lock; (2) Dominguez, the property manager, "had a history of not having the make-ready maintenance done on apartments and still letting tenants move into the unit"; (3) the apartment complex was a "'high crime area,' where there had been other burglaries and break-ins"; and (4) Dominguez knew there were break-ins occurring at vacant apartment units, but did nothing.

We have concluded that summary judgment was proper on the Lemuses' premises liability claim because they did not raise a fact issue regarding whether the risk of harm to the Lemuses was foreseeable. Without evidence of foreseeability, the Lemuses cannot establish their claim that Cookscreek was grossly negligent, that is, that Cookscreek had "actual, subjective awareness of the risk involved, but nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(B); *see also Gonzalez v. VATR Constr. LLC*, 418 S.W.3d 777, 789 (Tex. App.—Dallas 2013, no pet.) (finding of negligence

is prerequisite to finding of gross negligence). Consequently, summary judgment was proper on their claim for gross negligence. We decide issue 2.G against the Lemuses.

### g. DTPA (2.H)

The Lemuses argue that Cookscreek violated the DTPA by (1) failure to disclose "that make-ready maintenance was not being done" or that the lock on the window was not functional, (2) "representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced," and (3) engaging in an unconscionable course of conduct.[7] *See* TEX. BUS. & COM. CODE ANN. §§ 17.46(b)(22), (24); 17.45(5); 17.50(a)(1), (3).

The Lemuses rely on testimony of Najera and Acosta, current or former employees of Cookscreek, to raise a fact issue on the elements of their DTPA claim. They argue that Benjamin Dominguez, the property manager for Cookscreek at the time the Lemuses leased the apartment, "had a history of not doing the make-ready maintenance at other apartment units," according to Najera and Acosta. Najera testified that Dominguez was "not the most reliable of people, you could say." She testified to an instance when Dominguez told her "an apartment was ready when it clearly was not ready." She permitted the tenants to move in to the apartment, and was surprised when they later asked when the apartment was going to be finished. She testified, "there was no way that that—those people should have been living in that apartment." The apartment in question was not the apartment the Lemuses subsequently rented. Najera spoke with Acosta "about my frustration with Benjamin." Acosta replied that Dominguez "hasn't been overseeing the property very well."

---

[7] To prove unconscionability under the DTPA, a plaintiff must prove an act or practice which, to a consumer's detriment, takes advantage of his lack of knowledge, ability, experience, or capacity to a grossly unfair degree. TEX. BUS. & COM. CODE ANN. § 17.45(5); *Wayment v. Tex. Kenworth Co.*, 248 S.W.3d 883, 886 (Tex. App.—Dallas 2008, no pet.). Unconscionability under the DTPA is an objective standard for which scienter is irrelevant. *Wayment*, 248 S.W.3d at 886. "To prove an unconscionable action or course of action, a plaintiff must show that the defendant took advantage of his lack of knowledge and that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Id.* (internal quotations omitted).

Acosta also testified that Dominguez "wasn't doing his job well." She explained that every Monday, when they had conference calls with their supervisors, "there was something that they would catch onto him during the call." "There were reports that either he didn't have or things that were supposed to be complete and done but were not." She also explained that "every single time I went into the office, the office was a mess or there were things that weren't done correctly."

None of this testimony, however, raises a fact issue about whether Dominguez or any other employee or agent of Crookscreek made representations to the Lemuses that were not true, took advantage of the Lemuses's lack of knowledge resulting in "glaringly noticeable, flagrant, complete and unmitigated" unfairness to them, or represented that work or services had been done on goods when they had not. *See Wayment v. Tex. Kenworth Co.*, 248 S.W.3d 883, 886 (Tex. App.—Dallas 2008, no pet.) (discussing proof of unconscionability). There is evidence that the make-ready work for the Lemuses' apartment was not finished when initially promised, delaying their move-in date, but there is no evidence that any employee or agent of Crookscreek knew that the window latch was not operational but assured the Lemuses otherwise, and no evidence that the delay of the Lemus's move-in date was connected in any way to the attack on Martha. When asked, "Do you believe that the ownership or management of the Cookscreek Apartments made any false statements or representations to you or your husband?," Martha answered "no." Jimmy answered similar questions by stating that he was not sure whether Cookscreek made false representations or engaged in deceptive practices when dealing with him or with Martha. He did not testify to any.

Paragraph 9 of the lease sets forth the security devices that must be provided by the landlord: "Texas law requires, with some exceptions, that we must provide at no cost to you when occupancy begins: (1) a window latch on each window . . . ." Paragraph 9 also states, "If we fail to install or rekey security devices as required by law, you have the right to do so and deduct the reasonable cost from your next rent payment under Section 92.165(1), Texas Property Code."

–31–

Crookscreek also gave tenants "security guidelines" advising them to "[i]mmediately report in writing (dated and signed) to us any needed repairs of security devices, doors, windows, . . . as well as any other malfunctioning safety devices on the property . . . ." These provisions advise tenants that it is the landlord's responsibility to provide certain security devices, and that the tenant should tell the landlord if the devices are not installed or are not working. The Lemuses do not contend there is a misrepresentation or misleading statement in these provisions; their complaint is the landlord's alleged failure to provide a working window latch in violation of the property code. We conclude the Lemuses did not raise a genuine issue of material fact on these portions of their DPTA cause of action.

The Lemuses argue, however, that Monica Balderas, a Cookscreek employee, "made a misrepresentation to Jimmy Lemus by saying he couldn't get out of the lease." They contend that this "misrepresentation of the law" constitutes a representation that "an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law" in violation of DTPA section 17.46(b)(12). In their operative petition, the Lemuses pleaded, "[t]he agreement in this case was the contract for lease of the apartment unit, which Monica Balderas states imposed an 'obligation' which it did not, namely the obligation to stay in a lease even after you have been sexually assaulted. But, under Texas Property Code § 92.0161 a tenant can get out of a lease in that circumstance." To support this allegation, the Lemuses rely on Najera's testimony that she overheard part of a conversation between Balderas (who was Najera's supervisor) and Jimmy:

> Q. What portion of the conversation did you hear?
>
> A. Well, he [Jimmy] was frustrated because he wanted to get out of the contract because of what happened, because of the criminal activity. And I just remember hearing Monica saying, "Sir, there's nothing I can do"—the contract was signed and everything was done by procedure. And I just remember after that, he left the office pretty angry.

Because the Lemuses did not plead this allegation until their fifth amended petition, Cookscreek did not address it in its summary judgment motion.[8] Cookscreek did not amend its motion to address new allegations in the fifth amended petition. "Generally, a movant who does not amend or supplement its pending motion for summary judgment to address newly added claims alleged in a subsequent petition is not entitled to summary judgment on those claims." *Callahan v. Vitesse Aviation Servs., LLC*, 397 S.W.3d 342, 350 (Tex. App.—Dallas 2013, no pet.). Consequently, summary judgment was not proper on this portion of the Lemuses' DTPA claim. We express no opinion on the merits of this claim, and remand it to the trial court for further proceedings. With that exception, we decide issue 2.H against the Lemuses.

**h. Loss of consortium (2.I)**

As we have discussed, Cookscreek moved for summary judgment on the ground that loss of consortium is a type of damages, not a separate cause of action. Cookscreek did not allege any other ground for summary judgment on this claim. Because we are reversing the trial court's summary judgment in part and remanding the case for further proceedings, we express no opinion on possible damages the Lemuses may or may not recover if they prevail on a cause of action in the trial court on remand. We decide issue 2.I in favor of the Lemuses to the extent they may pursue a right to damages for loss of consortium on remand.

**i. Common law public nuisance (2.J) and statutory common nuisance (2.K)**

Cookscreek moved for summary judgment on the Lemuses' claims for public nuisance and statutory common nuisance on the grounds that (1) the Lemuses lacked standing to assert the cause of action, and (2) Cookscreek's actions "cannot constitute a 'public nuisance' as defined by applicable Texas law." Cookscreek argued that a public nuisance "involves an act or condition that subverts public health or public order or that constitutes an obstruction of public rights," and

---

[8] The fifth amended petition was filed on the same date as the Lemuses' summary judgment response.

"amounts to an unreasonable interference" with a right common "to all members of the general public." *See Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. App.—Austin 1998, no pet.).

The Lemuses argue the trial court erred by granting summary judgment on their claim for public nuisance. They argue that "[t]he public nuisance in this case was the tolerance of crime in the area of the Cooks Creek by Appellees," a "condition that resulted in an unreasonable interference with a right common to the general public." They contend they had standing to bring suit because Martha suffered a harm "different in kind from that suffered by the general public" when she was assaulted in the apartment. They argue that they raised genuine issues of material fact on this cause of action, relying on:

- Roddy's testimony that the level of crime around Cooks Creek Apartments was a seven or eight on a ten-point scale;

- Griego's testimony that a murder had been committed at Cooks Creek; and

- Acosta's testimony that on approximately three occasions prior to December 2014, maintenance staff at the complex reported to the manager that a vacant unit had been broken into.

Similarly, the Lemuses rely on the first two of these items to support their argument that they raised a fact issue on their claim for common nuisance under section 125.0015 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 125.0015. Subsection (b) of section 125.0015 provides that "[a] person maintains a common nuisance if the person maintains a multiunit residential property to which persons habitually go" to commit the criminal activities listed in subsection (a) and "knowingly tolerates the acts and furthermore fails to make reasonable attempts to abate the acts." *Id.* § 125.0015(b). Subsection (a) lists 27 offenses defined in the penal code and other statutes including gambling, prostitution, aggravated assault, sexual assault, robbery and aggravated robbery, murder, and criminal trespass. *See id.* § 125.0015(a)(1)–(27). An individual may bring suit under Chapter 125 to enjoin and abate a common nuisance. *Id.* § 125.002.

–34–

The Lemuses argue that the police officers' and Acosta's testimony about criminal activity in the Cooks Creek apartment complex is some evidence that Cookscreek maintained a public nuisance and a common nuisance in violation of Chapter 125. We disagree. To establish statutory common nuisance, the Lemuses were required to raise a fact issue that "persons habitually go" to the complex to commit the acts listed in section 125.0015(a) and that Cookscreek "knowingly tolerates" the acts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 125.0015(b). For public nuisance, the Lemuses were required to raise a fact issue that the criminal activity constituted "an unreasonable interference with a right common to the general public." *Jamail*, 970 S.W.2d at 676; *Lake Travis Indep. Sch. Dist. v. Lovelace*, 243 S.W.3d 244, 255 (Tex. App.—Austin 2007, no pet.). As we have explained in our premises liability discussion, the evidence relied on by the Lemuses does not raise a fact issue regarding frequent, similar, and recent criminal activity at the Cooks Creek complex. And, other than the instances of break-ins to vacant apartments and the broken window, the Lemuses did not offer summary judgment evidence that Cookscreek knew of any criminal activity at or near the complex and knowingly tolerated it. We decide issues 2.J and 2.K against the Lemuses.

### j. Bystander recovery (2.L)

Cookscreek moved for summary judgment on the ground that "where the primary victim's recovery against a Defendant is barred by an applicable defense, the bystander is not entitled to recover mental anguish damages," citing *Estate of Barrera v. Rosamond Village Ltd. P'ship*, 983 S.W.2d 795, 799–800 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Cookscreek argued that because it did not breach any duties it owed to Martha, Jane Doe cannot recover mental anguish damages as a bystander. Because we are reversing the trial court's summary judgment in part and remanding the case for further proceedings, however, we express no opinion on possible damages the Lemuses may or may not recover if they prevail on a cause of action in the trial court on

remand. We decide issue 2.L in favor of the Lemuses to the extent they may pursue recovery of bystander damages for Jane Doe on remand.

### k. Common law negligence (2.M)

As Cookscreek argued in its motion for summary judgment, the Lemuses are contending that their injuries and damages were caused by Cookscreek's failure to keep the property in a safe condition that would have prevented the assault from occurring. The Lemuses' claim is for premises liability, not general negligence. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010) ("We have repeatedly treated cases involving claims of inadequate security as premises-liability cases."); *Carbonara v. Tex. Stadium Corp.*, 244 S.W.3d 651, 656–57 (Tex. App.—Dallas 2008, no pet.) (summary judgment proper on negligence cause of action where appellant contended his injury resulted from premises defect, not negligent activity). In issue 2.M, the Lemuses argue that "negligence may be the proper cause of action here, including, possibly, negligent hiring and supervision of manager Benjamin Dominguez, as well as negligent repair regarding the window lock." The Lemuses did not plead a claim for negligent hiring. *See SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 355 (Tex. 1995) ("A defendant need not, however, show that the plaintiff cannot succeed on any theory *conceivable* in order to obtain summary judgment; he is only 'required to meet the plaintiff's case as pleaded.'") (quoting *Cook v. Brundidge, Fountain, Elliott & Churchill¸* 533 S.W.2d 751, 759 (Tex. 1976)). The Lemuses' claim for negligence regarding the window lock is a claim arising from Cookscreek's alleged failure to keep the property in a safe condition, a premises liability claim. We decide issue 2.M against the Lemuses.

### l. Breach of contract (2.N)

The Lemuses argue that they raised a fact issue on their claims for breach of contract under two different theories. First, the Lemuses contend they were third-party beneficiaries of a contract

between Cookscreek and MBP Texas. Second, in the alternative to their claim that the lease was invalid, the Lemuses argue that they raised a genuine issue of material fact whether Cookscreek breached the lease.

### (1) Third-party beneficiary

Cookscreek's summary judgment appendix includes a copy of a property management contract between Cookscreek and MBP Texas (the "MBP Contract"). The Lemuses argue they raised a fact issue regarding whether they were third-party beneficiaries of the MPB Contract. They contend (1) the MBP Contract is ambiguous, so it is for the jury to decide whether the contract conferred a benefit on the Lemuses; and (2) MBP's promised performance under the MBP Contract would satisfy a legal duty owed by Cookscreek to the Lemuses. Specifically, the Lemuses argue that because the terms "tenant finish-out" and "make ready maintenance" in the MBP contract are ambiguous, there is a fact question whether tenants are third-party beneficiaries of the contract. They argue, "Appellee MBP was to do 'make ready maintenance' to get apartments ready and make sure the locks were all functioning, which appears to be what is meant by 'tenant finish-out' in the [MBP Contract]." Cookscreek responds that there is a presumption against third-party beneficiary agreements, and there was no clear intent expressed in the contract to benefit tenants.

The Lemuses cite three cases in support of their argument: *City of Houston v. Williams*, 353 S.W.3d 128 (Tex. 2011), *First Bank v. Brumitt*, 519 S.W.3d 95 (Tex. 2017), and *South Texas Water Authority v. Lomas*, 223 S.W.3d 304 (Tex. 2007) (per curiam). In each of these cases, however, the supreme court clearly explained that "there is a presumption against conferring third-party beneficiary status on noncontracting parties." *Lomas*, 223 S.W.3d at 306; *see also Williams*, 353 S.W.3d at 145 ("the presumption is the parties contracted only for themselves"); *Brumitt*, 519 S.W.3d at 103 (same).

*Williams* is the only one of the three cases in which the court concluded the parties to a contract intended that a third party was a beneficiary. *See Williams*, 353 S.W.3d at 145–46; *cf. Brumitt*, 519 S.W.3d at 105 (seller of stock not third-party beneficiary of loan commitment letters between bank and buyer); *Lomas*, 223 S.W.3d at 307 (residents of city were not third-party beneficiaries of water-supply contract between water authority and city). In *Williams*, the court concluded that retired firefighters were third-party beneficiaries of three "meet and confer agreements" ("MCAs") between the city and the firefighters' union. *Williams*, 353 S.W.3d at 145–46. The court explained that the agreements "directly guarantee benefits to the Firefighters, in particular in terms of salary and termination payments, overtime pay, and vacation leave." *Id.* at 146 (footnotes omitted). The guarantees in the contracts "are not promised to the City or to the Union, but to the Firefighters." *Id.* The court concluded, "[a]s such, the City and the Union expressed a clear intent to benefit the Firefighters when they contracted through the MCAs." *Id.*

The Lemuses do not point to any similar language in the MBP Contract expressing a clear intent to benefit tenants. Relying on the supreme court's statement in *Lomas* that "[i]f performance will come to satisfy a duty or legally enforceable commitment owed by the promisee, then the third party is considered a creditor beneficiary," the Lemuses argue that because Cookscreek was required by statute to install window locks, MBP's performance of tenant finish out "would satisfy a legal duty owed by" Cookscreek to tenants as beneficiaries. *Lomas*, 223 S.W.3d at 306. But the court's explanation was to distinguish between creditor beneficiaries and donees, not to create a third-party beneficiary where the parties did not clearly intend to do so. *See id.* (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). In *MCI Telecommunications*, as in *Lomas*, the court was clear that "[t]he intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied." *MCI Telecomms.*, 995 S.W.2d at 651.

Further, the "ambiguity" the Lemuses rely on—that "tenant finish out"[9] might include provision of security devices required by statute—does not present a fact question for a jury. Whether the contract is ambiguous is a question of law. *Brumitt*, 519 S.W.3d at 105. If the contract is unambiguous, we construe it as a matter of law. *Id.* The only sentence mentioning tenant finish-out is in section 4(b)(vi) of the MBP Contract: "Owner authorizes any construction on the Property, including tenant finish-out, exterior non-structural repairs, maintenance, and/or renovation as deemed necessary, by Manager, to accomplish any written or perceived short and/or long term goals of the Owner and the Property, but not [sic] single expenditure for such purchase shall exceed $2,500.00 . . . without the express pre-authorization of Owner."

We conclude that nothing in this language raises a fact question regarding whether Cookscreek and MBP intended to benefit tenants by this provision. *See Brumitt*, 519 S.W.3d at 106 ("When a written contract is unambiguous and does not clearly express the parties' intent to create a third-party beneficiary, extrinsic evidence is simply irrelevant and inadmissible on that issue."). As the court explained in *Lomas*, "[a] third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit." *Lomas*, 223 S.W.3d at 306. We conclude the Lemuses were not third-party beneficiaries under the MBP Contract, and we decide this portion of issue 2.N against them.

### (2) Breach of lease by landlord

The Lemuses argue that Cookscreek breached the lease by (1) failing to provide security devices; and (2) failing to allow the Lemuses to move in on December 22. They argue that they performed under the lease by paying the security deposit and all other sums Cookscreek demanded

---

[9] Although the Lemuses argue that the term "make-ready maintenance" is also ambiguous, they did not provide a citation to the record where this language may be found in the MBP Contract. The only reference to "make-ready" appears to be in Exhibit B, "Manager's Compensation," showing an hourly rate at which the owner shall reimburse the manager for "make-ready." There is no indication of the parties' intent to benefit anyone other than the manager in this provision.

in order to move into the apartment. The Lemuses do not explain how the delay in their move-in date was the proximate cause of their damage. Consequently, we conclude the Lemuses did not raise a genuine issue of material fact on their claim for breach of a contract provision regarding their move-in date.

We also conclude, however, that the Lemuses raised a fact issue whether Cookscreek breached paragraph 9 of the lease, which provided:

> 9. SECURITY DEVICES. What we must provide. <u>Texas law requires, with some exceptions, that we must provide at no cost to you when occupancy begins: (1) a window latch on each window. . . . If we fail to install or rekey security devices as required by law, you have the right to do so and deduct the reasonable cost from your next rent payment under Section 92.165(1), Texas Property Code. . . .</u>
>
> Payment. We will pay for missing security devices that are required by statute. . . .

Cookscreek argues that "nothing in the Lease Agreement obligated [Cookscreek] to do anything that it did not do," because it "did not include any guarantees regarding Tenant safety"; the tenant "agreed to accept the unit 'as is,' and all implied warranties were expressly disclaimed"; and the Lemuses "did not tender a timely Inventory and Condition form referencing any defects or alleged defects or damages."

Despite its disclaimers, the lease unambiguously places the responsibility for providing window latches on the landlord as "Texas law requires." The Lemuses raised a fact issue whether Cookscreek provided a working window latch on the window through which Thomas likely gained entrance to the apartment. Although we agree that Cookscreek did not guarantee its tenants' safety, the lease includes Cookscreek's promise to provide the security devices required by law. Further, Cookscreek does not include a citation to any requirement in the lease that a tenant (1) complete an "Inventory and Condition form," or (2) do so within any particular time frame. Although a jury may ultimately conclude that Cookscreek fulfilled its contractual obligations to the Lemuses, the

Lemuses have raised a genuine issue of material fact on their claim that Cookscreek breached the lease. We decide this portion of issue 2.N in favor of the Lemuses.

**CONCLUSION**

We have decided issues 1, 2.A, 2.B, 2.C, 2.E, 2.F, 2.G, 2.J, 2.K, 2.M, portions of issue 2.H (DTPA claims for failure to disclose, representations regarding work or services performed, and unconscionable conduct), portions of issue 2.N (claim that the Lemuses are third-party beneficiaries of the property management agreement, and claim for breach of contract regarding move-in date), and issue 3 against the Lemuses. We have sustained issues 2.D, 2.I, 2.L, and the remaining portions of issues 2.H and 2.N, concluding that summary judgment was not proper on the Lemuses' claim under sections 92.153 and 92.164 of the property code (issue 2.D), a portion of their DTPA claim (portion of issue 2.H regarding misrepresentation of rights or remedies under lease), their claims for loss of consortium (issue 2.I) and bystander recovery (issue 2.L), and their claim for breach of lease (portion of issue 2.N regarding failure to provide security devices). Accordingly, we affirm the trial court's judgment in part, reverse it in part, and remand for further proceedings consistent with this opinion.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

171085F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MARTHA ARELY LARA LEMUS,
JIMMY LEMUS AND JANE DOE, A
MINOR CHILD, Appellants

No. 05-17-01085-CV     V.

COOKSCREEK 255, LLC, AND MBP
TEXAS, LLC, D/B/A CATALYST
MULTIFAMILY, Appellees

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-15-15468.
Opinion delivered by Justice Lang-Miers;
Justices Bridges and Francis, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment granting summary judgment for appellees Cookscreek 255, LLC and MBP Texas, LLC, d/b/a Catalyst Multifamily on appellants' claims: (1) under sections 92.153 and 92.164 of the property code, (2) under the deceptive trade practices act for misrepresentation of rights or remedies under the lease, (3) for loss of consortium, (4) for bystander recovery, and (5) for breach of lease for failure to provide security devices. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellants Martha Arely Lara Lemus, Jimmy Lemus and Jane Doe, a Minor Child recover their costs of this appeal from appellee Cookscreek 255, LLLC, and MBP Texas, LLC, d/b/a Catalyst Multifamily.

Judgment entered this 30th day of November, 2018.